Call up case 19-2400, IBSA v. Teva. Mr. Johnson, whenever you're ready. Thank you, Your Honor. And may it please the Court, Ryan Johnson from Fenwick & West on behalf of the IBSA Appellants. Your Honor, this appeal concerns a single claim term, the word half liquid. Now, the District Court found itself unable to construe that term and held it to be indefinite. But the Court deprived itself of two critical guides to the term's meaning, both of them within the intrinsic evidence. First, there's the inventor's Italian Priority Application. And every single place where the 390 patent uses the term half liquid, the Italian application uses the term semi-liquido, which can also be translated as semi-liquid, which is a well-known and commonly understood term. And to be clear, Your Honor, it's a perfect one-to-one match. The Italian application uses semi-liquido the same number of times in the same places within the specification to describe the same chemicals and compositions described as half liquids in the 390 patent. So if one were trying to understand what the inventors meant by half liquid, their corresponding use of a well-known term, semi-liquid, in their original application is a natural place to look and a highly helpful source. Yet the District Court declined to consider it. Instead, it gave the document no weight whatsoever, and the Court's reasons for doing so simply don't hold up. First, the District Court professed to be quite sure that documents written in a foreign language are irrelevant to claim construction. Now, the District Court cited no precedent for that finding, and that's because there is none. Your Honor, there's no precedent whatsoever for discounting evidence because it's written in a foreign language. Not in claim construction, not in indefiniteness, not in any other patent infringement or validity analysis. And in fact, this Court and many others around the country regularly consider foreign language documents in construing claims. Here, considering the inventor's original application written in their native tongue undeniably helps illuminate the inventor's understanding of their invention. And this Court has emphasized time and again that that's an important aim of claim construction, but that's one that the District Court missed altogether. Now, the District Court's second reason for discounting the Italian application was that the District Court focused on some differences in word choice and phrasing between IBSA's translation of the Italian application and the 390 patent. And according to the District Court, those differences conclusively establish that the inventors deliberately used a different word in the United States, that is, half liquid, to convey a different meaning than semi-liquid. But, Your Honor, that interpretation is not correct, and frankly, it's not reasonable. The differences between the translation of the Italian application and the 390 patent that the Court mentioned, the Court highlighted the field of invention and prior art sections of the patent. They're extremely minor. We're talking about one translator's word choice or phrasing as compared to another. These are not substantive differences. And I'd invite you to compare the language used in the specification in our translation versus the 390 patent. You'll see what I mean. You'll see that the inventors' use of semi-liquido directly parallels their usage of half liquid in the 390 patent. But, Your Honor, there's no indication that the District Court actually considered this important context. Had it, it could not have concluded that the inventors intended to convey some different but undisclosed meaning by using the term half liquid. Your Honors, in the end, there's no evidence whatsoever in the record showing that the inventors intended those terms to have some different meaning or scope. And that's totally consistent with this Court's precedence explaining that two different words can, in fact, mean the same thing. In other words, they can be synonyms. And that's even when they're both used... Let me ask you. Was Dr. Shial... I don't know how to pronounce the name. C-H-Y-A-L-L. How do you pronounce that? That's Dr. Shial, Your Honor. Shial. Okay. He was your expert. And I think the District Court relied on this, but he was unable to articulate the meets and bounds of the term. Was he not? No, Your Honor. In fact, Dr. Shial gave clear explanations of the boundaries of the term half liquid, certainly clear enough for a person of ordinary skill to understand what half liquids are and what they're not. Do you want to have me cite? Why don't you cite me to the appendix while you're talking about it? Sure, Your Honor. Just give me one moment to identify that. Now, Dr. Shial described liquids as free-flowing. They're things that do not have a thick consistency, and that's in the appendix at 718, page 66, lines 5 through 7. He also described liquids as solvents, such as methanol, ethanol, acetone, ethyl acetate. He said these were things that you buy in jugs and you could pour out readily. They flow like water. That's in the appendix at 722. That's page 84 of his transcript lines 11 through 18. And then he described that semi-liquids and half-liquids, they have thick consistencies between a liquid and a solid, they respond to gravity, and they will flow. And that's in the appendix at page 707, page 23 of his transcript, line 22, through page 25, line 19. And he offered examples, clear examples of these substances, syrups, toothpaste, peanut butter. Those are in the appendix at pages 710, 725, and 721. Now, he also explained how... I'm sorry. Was there a question? Yeah, this is Judge Ranum. But he was also asked during the deposition, he was asked if I wanted to make a soft, elastic capsule that contained thyroid hormones, gelatin, and glycerol, and I wanted the interface not to be a half-liquid. How would I test to know whether I achieved that goal? And he responded that he wasn't sure. It seems that throughout even that deposition that he refused to clarify how one would determine whether a substance was half-liquid or a solid. So your own expert wasn't able to explain the parameters of half-liquid. Well, it's interesting, Your Honor, because Dr. Schall was asked, what are the range of consistencies that are associated with a half-liquid versus something else? What are the numerical values? And what he said was that's not necessary to determine whether something is a half-liquid versus a solid. He said persons of underskill understand, without some quantification or some kind of a test method, when they're working with a half-liquid versus a solid. And that's in the appendix at page 737. It's page 144 of his transcript, lines 4 through 11. So this is a limitation that you'll know it when you see it? It's a limitation that persons of ordinary skill understand, Your Honor, because, first, there are clear examples in the patent of what half-liquids are. The patent lists out chemicals that persons of ordinary skill could use as liquids or half-liquids to make these capsules. And Dr. Schall explained during his deposition that a lot of these are substances that have a thick consistency in between solid and liquid. But that's hardly specific. I mean, just because it includes something and it doesn't include others is hardly dispositive of determining what the meets and bounds are of the term used, right? Well, Your Honor, terms are construed according to their plain and ordinary meanings of persons of ordinary skill in the art. And the point is that persons of ordinary skill have no difficulty distinguishing between half-liquids and solids. So the claims in question, they cover capsules filled with liquids or half-liquids. So what's outside the claims are solids. And the patent gives very, very clear guidance on what solids are, the pharmaceutical solids that can be filled within these capsules. And these are hard, dry materials like pellets and granules and powders. There's no question that a person of ordinary skill in the art can distinguish between those things and the liquids and half-liquids that are covered by the claims. That's Dr. Schall's testimony, and that's perfectly consistent with the intrinsic evidence. That's what the intrinsic evidence shows, and that's what a person of ordinary skill understands. And, Your Honor, that brings me to the second issue that the district court failed to consider, or rather, the second error in evaluating the intrinsic evidence that the district court made, and that was not actually considering the specification. The court said, I'll look to the specification for guidance on the meaning of half-liquid. But, Your Honors, the district court's discussion of the specification, it's just four sentences long. The court never mentioned the most relevant information, the examples of half-liquids given within the 390 patents specification, and that's a list. In column eight, lines 43 through 45, these are the types of chemicals that can be used to create liquids and half-liquid fillings. Your Honor, the patent says that persons of ordinary skill in the art can use these chemicals or others that are, quote, commonly used in the pharmaceutical field to create SEC soft elastic capsules with liquid or half-liquid content. So, the inventors are referencing commonly used half-liquids, and that's incompatible with the suggestion that this might be some obscure or unknown category of chemicals. And the patent also includes experimental examples. That's columns 10 through 14, and these are capsules and capsule fillings that comprise liquids or half-liquids. Now, IBSA explained that persons of ordinary skill know that many of these substances are thick biscuits materials with a consistency that's not solid, but also not purely liquid, and Dr. Scheil testified to that very same thing. And that guidance is embodied in the second part of IBSA's proposed construction of half-liquid that provides that a half-liquid has a thick consistency between solid and liquid, and that's consistent with the dictionary definitions that IBSA offered, and it's consistent with the pharmaceutical packaging textbook that IBSA offered as extrinsic evidence, but, Your Honor, the court never mentioned this aspect of IBSA's construction at all. It quoted it in a pro forma copy and paste of IBSA's construction at the outset of the court's opinion, but the court literally never addressed it, nor did it address any of this guidance in the specification on this point. So, Your Honor, the court's failure to address... Let me just ask you about the standard of review, because there's a little bit of a disagreement, I think, or a discussion of that in the briefs. What's your position on what the standard of review is? Your Honor, the determination of indefiniteness is reviewed de novo, and the district court's evaluation of the intrinsic evidence as it relates to claim construction and indefiniteness is also reviewed de novo, and the district court's consideration of extrinsic evidence is indeed reviewed for clear error, and I think that's clear from... Thank you. You're welcome, Your Honor. Now, I'd like to talk a little bit about the extrinsic evidence. One piece of extrinsic evidence that the district court did consider was the opinion of TEVA's expert, Dr. Kahn. But, Your Honor, this court has made clear that conclusory, unsupported assertions of experts are not useful to courts when construing claims. That's language directly from this court's en banc Phillips decision. It's hard to imagine more conclusory, more unsupported opinion than Dr. Kahn's. There's no discussion of the relevant technology, no mention of any of the intrinsic or extrinsic evidence, no discussion of any analysis that he did. That's not clear and convincing evidence of indefiniteness, Your Honors. And he had quite a bit more to say during his deposition. He offered up a whole host of new technical opinions about what half-liquids and semi-liquids are. Not only were those brand-new opinions unsupported by any evidence, they're also untimely and prejudicial to IBSA. Okay. Your Honor, I believe I heard something. Yes, we all heard it. Thank you. Well, we certainly need your time for rebuttal. Let's hear from the other side. Thank you. Mr. Rosenthal. May it please the Court. The patent in suit claims a soft-gel capsule with a liquid or half-liquid interface. After considering all of the intrinsic and extrinsic evidence, including the expert declarations and testimony from both sides, the district court found that the term half-liquid is ambiguous and that a skilled artisan at the time of the invention would not know with reasonable certainty whether an interface is or is not a half-liquid within the meaning of the claim. And that's important because it means that the claims do not give the public adequate notice of what is still open to them. In other words, a person wishing... Let me interrupt just with two quick little points. One is, on the standard of review, I have a vague recognition that you are arguing because extrinsic evidence was involved, the entirety of our review should not be de novo. Is that your position, or do you agree with your friend? Well, Your Honour, the legal conclusion of indefiniteness is reviewed de novo, but I think that given the factual findings here, the factual findings are reviewed for clear error because they are based in part on extrinsic evidence. Excuse me. Is the distinction here to be drawn with regard to the intrinsic versus the extrinsic evidence? Is that correct? I don't see how there's a way to draw that distinction here because ultimately the question is, what would a person of ordinary skill in the art understand? And in answering at the relevant time, and in answering that question, the court relied on both the intrinsic evidence and the extrinsic evidence. So I don't know how you would review one part of that. If you did a de novo review of the intrinsic evidence, how would you then weigh it with the extrinsic evidence? So I think that the way this comes before the court, the factual findings should be reviewed for clear error. The factual findings, okay. And let me ask you, what do we do with the statement made by the district court about not considering the Italian translation stuff? Well, I think we should be careful to look at exactly what the court said. And he did not say what Mr. Johnson said he said. The judge said in a footnote, first of all, I think we should say he didn't say he wasn't considering it. He didn't say as a matter of law, I'm not going to look at this. If he had said that, I think this would be a different case. What he said in a footnote on page 12 of the joint appendix is, I'm dubious that the Italian language materials, even as part of the intrinsic record, in form of COSA's understanding. So he's saying essentially, it's not clear to me that I really need to do this analysis. But he then spends all of page 12 doing the analysis. So he considers exactly the argument that was put beforehand. And I think it's worth focusing on exactly what that argument was. So you start with the term half liquid in the claims, and you're trying to figure out what that means. And the argument put forth by IPSA is, well, if you look at the Italian priority document, you'll find that there's an Italian word, semiliquido, that appears to correspond to the term half liquid. And then they say, and we're telling you, Judge, that semiliquido really means semi-liquid because we did a translation after this lawsuit started and 18 years after the application was filed, in which our translator said that semiliquido can be translated as semi-liquid. And therefore, you ought to interpret half liquid, which is the only term we care about, as a synonym of semi-liquid. But it's worth pointing out that absolutely nothing in the intrinsic evidence, or even in their translation, equates the word half liquid with the word semi-liquid in English. There is no place where the inventors or anybody else said these two terms mean the same thing. They are asking the court to draw an inference about the meaning of one term based on a post hoc litigation-inspired translation of a different term from the Italian priority document. And what the district court said was, okay, I'm confronted with essentially these two competing translations of this Italian term. And it's worth pointing out that this is not a case where the Italian priority document gives an explanation for what the term means. It's not a case where the Italian priority document says semiliquido, and by semiliquido we mean XYZ. All we're left with is the bare word semiliquido, which was rendered once as half liquid in the application, and now, you know, 18 years later has been translated as semiliquid in the new translation. And the district court on page 12 of the joint appendix says, plaintiff's retranslation of the Italian priority application is not, however, good evidence of what the applicant meant by semiliquido. A comparison of plaintiff's translation of the Italian application's field of invention and prior art sections against those portions of the 390 patent specification quickly reveals that the applicant and the translator regularly interpret words and phrases differently. The inconsistency between the two translations is likely because translation requires the translator to use judgment. So he says, I'm confronted with these two competing translations, and I credit not the latecomer litigation-inspired translation that's being offered to me. I credit the one given by the inventors to the patent office at the relevant time. And I find that that's the best evidence of what they intended the word to be rendered as in English. And based on that, I don't give any weight to either your late translation or the naked word in Italian, semiliquido, which I have to interpret using two competing translations. And the translation that they have offered, of course, is extrinsic evidence and not intrinsic evidence. I think that Mr. Johnson, in his argument, sort of assumes that the word semiliquid in English appears in the Italian priority document. That's just not the case. The only evidence we have of semiliquid is in the form of translations, which are both extrinsic evidence and not intrinsic evidence. I think it's also relevant, and by the way, Mr. Johnson said that he invited the court to compare the two translations and see that there were no significant differences. But if we apply the form of argument that he has espoused, that IBSA has espoused, to other words in those sections, we come up with a problem. So, for example, the court said that if you look at the prior art section and compare it to the patent specification, you find that the translator interpreted the words differently from the application. And one example of that is in the title of the section itself, because in the translation supplied by IBSA, the section is entitled Prior Art. But in the application and in the patent, the section is entitled State of the Art. And so if we take the argument that's being put forward by IBSA, we would say, well, State of the Art appears in the U.S. application. There's some Italian word that corresponds to that in the Italian priority document. That's been translated 19 years later as Prior Art, and therefore we must assume that State of the Art is synonymous with Prior Art. And that's just not a very convincing argument, because the terms don't really mean the same thing. And we don't know if that's a disagreement in the translation of the Italian original, or if it represents a decision by the applicant to use different words in the application than they use in the Italian document. But either way, it's just not a sound reason to change the meaning of State of the Art and treat it as if the words were Prior Art, which is essentially what IBSA is asking the court to do. It is also relevant that when we look at... Can I just interrupt before your time runs out? I just wanted to ask you about the argument on the other side that Dr. Kahn's opinions come largely from his deposition testimony and therefore are not in compliance with FRCP 26. Well, Your Honor, there are two problems with that argument from the other side. It's true that some of the opinions that he gave were elicited at his deposition. They were elicited by IBSA asking him questions at his deposition. They were not elicited by us. And it's certainly not the case that you can ask an expert questions at their deposition, get answers that you find unhelpful, and then simply ignore the answers that you don't like. So they're the ones who brought that information into the record, not us, and now they're stuck with it. The second problem is that they didn't ask the district court to do anything about that issue. They didn't object to the testimony. They didn't ask for supplemental briefing. They didn't suggest that the court ought not to consider those opinions. In fact, the depositions were taken after the claim construction briefing was largely completed, and so there was a supplemental round of letters submitted specifically on the contents of the depositions and the opinions offered at the depositions for the district court to consider, and at no time did IBSA suggest that there was any impropriety in relying on those materials. So for the court to suggest that the court somehow erred in relying on that, it's really too late for them to do it. To the extent there's anything to waive, they have waived the waiver by failing to raise that issue until their reply brief on appeal. Is it your view that reliance on Dr. Kahn's testimony is necessary for an affirmance in this case? No, Your Honor. I think that it is significant that we have a battle of the experts here, and the district court did credit Dr. Kahn's opinion. Dr. Kahn is one of the most distinguished formulators in the country and chose not to credit Dr. Child's opinion, but I don't think it's necessary to rely on Dr. Kahn's opinion in order to affirm because Dr. Child was unable, as the passage that Judge Rayna pointed to illustrates, Mr. Child was unable to explain how you would tell what is a half-liquid or a semi-liquid and what is not within the meaning of the claims. We asked him, he said in his declaration, well, half-liquid and semi-liquid are synonyms, and semi-fluid is also a synonym. And then in his declaration, he was unable to explain the relationship between those words. Well, sometimes a semi-fluid is a half-liquid, sometimes a semi-liquid is a semi-fluid, but not always, and he was unable to set up the clear relation of those, and he was unable to explain how it is that one can tell when one has a semi-liquid or a half-liquid as opposed to something that is not a half-liquid. And so I think that even without relying on Dr. Kahn, it would be possible for the court to affirm, although this isn't an instance where there were competing understandings of the term semi-liquid. Dr. Kahn said that it's not a term that makes sense in the context of a finished dosage form. It's a term that makes sense only in the context of a pharmaceutical that's being processed, and therefore a person of ordinary skill would not understand the term as being relevant in the context of the patent. And so you had two different opinions about what even the term semi-liquid means. It's also noteworthy that even the dictionaries that Dr. Shile pointed to, and they were the only basis for his opinion because he didn't have any scientific literature using the term half-liquid. He wasn't able to point to anything other than these dictionaries, which were all definitions of the term semi-liquid and not half-liquid. Those sort of general-purpose dictionaries don't all say that it means a viscous liquid. For example, Webster's Collegiate Dictionary says that it means having the qualities of both a liquid and a solid. And the example that's given is semi-liquid manure, which, first of all, calls to mind something more like a flurry that has chunks in it than a viscous liquid, and second of all, is a reminder of how far these dictionaries are from the pharmaceutical context that ought to be the focus of the claims. So I do want... I apologize. How much time is remaining? I'm not... I've lost... We didn't hear the bell yet, did we? No. One minute, Your Honor. One minute. Okay. You've got one minute. Well, I just wanted to finish by pointing to one point of the intrinsic evidence that is important, I think, and that is that there was a point in time in which the word half-liquid and the word semi-liquid were both used in a proposed claim, and then, ultimately, the word semi-liquid was removed and the word half-liquid was left. And that indicates that, for whatever reason, the applicants were aware of both terms and chose to use one and not the other, and that is further support for the conclusion that they're not synonyms and that the district court properly found that the meets and bounds of the term half-liquid are not discernible to people of ordinary skill in the art. For that reason, because there was no clear error in those findings, this court should affirm the district court's judgment that the patents are invalid due to indefiniteness. Thank you. Perfect timing. Now we have rebuttal time. Mr. Johnson. Thank you, Your Honor. I don't think I have too much time left, but I would love to address a couple of points that Mr. Rosenthal raised. The first is the standard of review. I believe there's the HZNP case that's cited in the party's briefing that very clearly says that in an indefiniteness posture, the court reviews the determination of indefiniteness de novo, reviews the lower court's evaluation of intrinsic evidence de novo, and reviews the lower court's evaluation of the extrinsic evidence for clear errors. That's clear from the HZNP cases and others cited in our briefs, Your Honor. I also want to address Mr. Rosenthal's comment that we're relying on this post-hoc litigation-inspired translation, which is something that he referenced a few times. Your Honor, TEVA's never contested that translation. But there's no evidence whatsoever that the translation of semi-liquido to semi-liquid is in some way inaccurate. And in fact, Your Honor, the facts of this case are that both sides' experts, Dr. Kahn for TEVA and Dr. Scheil for IBSA, agreed that they readily understood that semi-liquido meant semi-liquid without any need for a translation. So those are the facts here. And finally, Your Honor, as to Dr. Kahn, Mr. Rosenthal pointed out that the testimony we're objecting to was elicited by IBSA. Your Honor, it can't be the case that an expert can hold back a slew of opinions on technical and scientific issues that aren't hinted at anywhere in a declaration and then offer them up for the first time during a deposition, springing them on the other side, and thereby depriving the other side of an opportunity to cross him fairly or offer their own expert testimony in response. That can't be the case, and that's what Rule 26 warns against. And the idea that IBSA didn't object to this below, and so therefore can't object now, below Dr. Kahn's new testimony was the subject of one or two paragraphs in a supplemental letter brief, a third round of briefing before the district court. Now it's an important centerpiece of Tevin's argument on appeal, and that's improper, Your Honor. I know that my time is up. Thank you. Thank you, Your Honor, for your time. We thank both sides and the case submitters. That concludes our proceeding for this morning. The honorable court is adjourned until tomorrow morning at 10 a.m.